UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------- X

ROGER SPOOL,                                                         )
CHILD & FAMILY ADOPTION,                                             )    **COMPLAINT**
BRUCE AND CHARLENE FERGUSON,                                         )    **UNDER THE**
                                         Plaintiffs,                 )    **RACKETEER**
                                                                     )    **INFLUENCED**
– against –                                                          )    **AND CORRUPT**
                                                                     )    **ORGANIZATIONS ACT**
WORLD CHILD INTERNATIONAL ADOPTION AGENCY,                           )
JENKINS & POVTAK,                                                    )    **06 CIV. 4243**
SUSAN DIBBLE,                                                        )
DOREEN WHITTAKER,                                                    )    JURY DEMANDED
SHARRELL J. GOOLSBY,                                                 )
CARL A. JENKINS,                                                     )
YAROSLAV PANASOV,                                                    )    ECF CASE
                                         Defendants.  )
-------------------------------------------------------------------------- X    **BRIEANT**

Roger Spool, Child & Family Adoption and Bruce and Charlene Ferguson, allege for their

complaint as follows:

## THE PARTIES

1.  Plaintiff Roger Spool [Spool] is a resident of Ulster county New York and is a New York

    licensed social worker and Executive Director of an adoption agency he founded called

    Child & Family Adoption [CFA] which is an authorized adoption agency in the State of

    New York.

2.  Bruce and Charlene Fergusen [the Fergusons] are residents of Dutchess county New

    York and were clients of CFA.

3.  World Child International Adoption Agency [World Child] is headquartered in Silver

    Springs, Maryland and is a non-profit child-placing agency that specializes in

    international adoption.

1

4.    Jenkins & Povtak is a Maryland law firm.

5.    Susan Dibble [Dibble] is a resident of Ulster county New York and a former employee of CFA.

6.    Doreen Whittaker [Whittaker] is a resident of Ulster county New York and a former employee of CFA.

7.    Sharrell J. Goolsby [Goolsby] is a resident of Maryland and the executive director of World Child.

8.    Carl A. Jenkins [Jenkins] is a resident of Maryland and World Child's attorney.

9.    Yaroslav Panasov [Panasov] is a Russian national and the Moscow Representative for World Child. His contact information is listed as the Office Director, World Child Office, Moscow, Russia.

10.    Each and every defendant is liable as a principal pursuant to 18 USC 2(a)-(b) and that each and every defendant is liable as a co-conspirator pursuant to 18 USC 371.

## RICO JURISDICTION AND VENUE

11.    Federal jurisdiction is invoked pursuant to 28 USC § 1331.

12.    This Court has subject matter jurisdiction over the action pursuant to 18 USC 1964(a), 18 USC 1964(c), 18 USC 1965(a), 18 USC 1965(b), 18 USC 1965(d), 7 USC 25(c), 15 USC 77v, 15 USC 78aa, 18 USC 1331, 28 USC 2201-02, 28 USC 1337 and 28 USC 1391(b).

13.    Venue is proper within this judicial district pursuant to 28 USC 1391(b) inasmuch as Defendants Dibble and Whittaker reside in this district and are RICO co-conspirators. All defendants transact business within this district and the Plaintiffs reside in Rockland county, New York.

14.  Venue is properly in this district pursuant to 28 USC 1391, 15 USC 77v, 15 USC 78aa, 18
     USC 1965 and 7 USC 25(c).

**INTRODUCTION**

15.  The Plaintiffs repeat and reallege Paragraphs 1 through 14 above.

16.  The Plaintiffs bring this case against the Defendants for violations of the federal RICO
     statute; for fraud, misrepresentation, breach of fiduciary duty, forgery, theft, false
     impersonation, and negligence.

17.  Defendant World Child is a large international adoption agency operating, legally and
     illegally, in all 50 states and the District of Columbia.

18.  Defendant World Child is in the business of obtaining Russian, East European, Central
     American and Chinese children for individuals in the United States to adopt.

19.  Defendant World Child procures children utilizing a variety of intermediaries and agents
     in foreign countries including Defendant Panasov.

20.  Defendant Panasov, utilizing personal and family contacts in Russia, secures adoptions
     from local officials and courts by using a variety of legal and questionable means.
     Foreign agents like Panasov also provide adoption services to Americans including
     travel, interpretation, room and board, transportation and even legal representation.

21.  Defendant World Child assists adoptive couples with immigration and foreign adoption
     paperwork, often charging tens of thousands of dollars, while offering no guarantee of a
     successfully completed adoption, the healthiness or well-being of the child, or the
     honesty and integrity of the process.

3

22. For many years Plaintiffs Spool and CFA worked cooperatively with Defendants World Child, Goolsby, Jenkins and Panasov to place Russian children into the homes of American families.

23. This arrangement began to unravel when World Child—although receiving more services from Plaintiff Spool and CFA for no additional money—demanded a greater percentage of the joint-venture's generated fees and began to refuse to pay invoices and actively contest the legitimacy of CFA's charges.

24. Finally the Defendants secretly colluded with long-time CFA employees Dibble and Whittaker to steal the assets of CFA white Plaintiff Spool was on vacation and re-direct the joint-venture's past, present and future clients to a new unauthorized entity [New York Representative Office].

25. The New York Representative Office was not authorized by the State of New York to conduct adoption activities and was not staffed by any licensed professionals.

26. Defendants Dibble and Whittaker, in carrying out the scheme, utilized Defendant Spool's stolen social work license, the CFA agency license and CFA letterhead to continue servicing the joint-venture's clients.

27. Defendants Dibble and Whittaker forged documents and signatures, submitted unauthorized documents on behalf of clients, utilized CFA letterhead and substituted documents from one client to another to advance the activities of the New York Representative Office and collect fees from clients.

28. Clients, such as Plaintiff Fergusons, believed that the "relocation" of World Child's New York office was routine and were encouraged by the New York Representative Office to

believe that their adoptions were being handled by licensed professionals at a New York

authorized adoption agency.

29.    Instead, Plaintiff Fergusons' entire case file, including confidential and personal

documents, were being subjected to forgery and fraud while the Fergusons continued to

pay significant fees to process their Russian adoption.

30.    Ultimately Defendants Dibble and Whittaker were investigated and plead guilty to

forgery.

31.    After their arrest and arraignment, Defendants Dibble and Whittaker continued to

operate the New York Representative Office, even after Plaintiff Spool informed

Defendant Goolsby that illegal activities were taking place there.

32.    After her arrest and arraignment, Defendant Dibble continued to work with Plaintiff

Fergusons, forging and faking documents which were ultimately submitted to Defendant

Panasov and the Russian government through World Child's Maryland office.

33.    When Plaintiff Fergusons traveled to Russia to adopt, the Russian court discovered the

New York Representative Office's deceptions and denied the adoption due to fraudulent

documents.

34.    Plaintiff Spool and CFA were left with unpaid invoices, lost past, present and future

clients, and a damaged reputation which drove CFA to the brink of bankruptcy.

## RICO FACTUAL ALLEGATIONS – ROGER SPOOL AND
## CHILD AND FAMILY ADOPTION, INC.

35.    The Plaintiffs repeat and reallege Paragraphs 1 through 34 above.

36.    In August 1994, a medium sized international adoption agency, World Child, partnered with a well-respected New York adoption agency, CFA to expand World Child's international adoption program to New York State.

37.    During the next ten years, World Child and CFA worked closely together to build and expand an international adoption business throughout New York.  Ultimately World Child and CFA were handling over 120 international adoptions per year and World Child grew into the fourth or fifth largest international adoption agency in the United States.

38.    Throughout this period, World Child located children and processed international dossiers and CFA serviced adoptive parents and conducted home studies and post-placement visits.  CFA also did all the marketing for the joint venture in New York State and assisted New York clients in assembling and processing their international dossiers.  CFA hosted and organized dinner parties for foreign adoption and government dignitaries on behalf of the joint venture and organized a large national gathering in New Paltz, New York for World Child families nationwide.

39.    World Child paid CFA a fixed amount on each case for the services CFA provided to New York clients.  This amount remained essentially unchanged during the entire period and CFA provided additional services with no increase in fees.

40.    In late 2003, World Child's payments to CFA grew increasingly delinquent.

41.    On February 20, 2004, Goolsby sent a memo to Spool proposing a change in payment structure which would reduce CFA's per case payments by almost 40%.

6

42.    In the memo, Goolsby expressed a concern that CFA's longtime employee Dibble, who

worked on international adoptions as a non-licensed program coordinator, would soon

leave and proposed hiring Dibble as a World Child employee.

43.    On February 27, 2004, Spool replied seeking clarification on Goolsby's unilateral offer

and requesting payment of outstanding invoices.

44.    On March 8, 2004, Goolsby sought a proposal from Spool regarding "a fair

reimbursement for [CFA's] homestudy license.  Goolsby once again proposed that World

Child hire Dibble as a World Child employee.  Jenkins was copied on this

communication.

45.    On March 24, 2004, Spool sent Goolsby a letter expressing concern about the over

$25,000 in outstanding invoices owed to CFA by World Child and questioned the ability

of World Child to pay what it owed.

46.    On March 30, 2004, Goolsby replied questioning the amount owed and expressing a

desire to phase out operations with CFA.

47.    On April 2, 2004, Jenkins sent Spool a letter on Jenkins and Potak letterhead accusing

CFA of terminating its relationship with World Child.  Jenkins announces that World

Child immediately and unilaterally "revokes and renounces any authority you feel you

may have had to act on their behalf, including but not limited to contractual abilities or

commitments, authorization for payment of debts, dues, claims and representations of

any nature whatsoever."

48.    On April 3, 2004, Spool left with his wife Lilyan on a one week foreign vacation.  They left

their two longtime employees Dibble and Whittaker in charge of the CFA office.

49. Due to the ongoing dispute with World Child, Spool instructed both Whittaker and Dibble not to have any conversations with Jenkins or Goolsby. He specifically admonished his employees not to answer any questions from them and to refer their calls to him on his cell phone.

50. On April 7, 2004, in the middle of Spool's vacation, Jenkins faxed Spool a letter on Jenkins and Potak letterhead confirming a threatened "shut-off" of World Child operations in New York and offering a "transfer of business matters" including "costs of telephones, mail handling or incidentals" from CFA to World Child. This letter was copied to Goolsby and was time stamped 18:55 GMT or 1:55 PM.

51. In reality, this conversation between Spool and Jenkins never occurred.

52. Approximately one hour before this fax, at 12:47 PM, a fax from CFA's office was sent to American Long Lines, instructing them to immediately transfer the forwarding of CFA's toll free number to a new number. At the bottom of the fax were Spool and Goolsby's typed names.

53. In reality, Spool never approved this transfer.

54. The next day, April 8, 2004, Dibble emailed Spool announcing that she had accepted another position that she was starting immediately.

55. Later that day, Goolsby announced in a memo on World Child letterhead to "All Current NY Families" that World Child's New York office was relocating. The memo was copied to Dibble.

56. Finally, on April 8, 2004 Jenkins sent a letter on World Child letterhead to American Long Lines in Horsham, Pennsylvania stating that "World Child is no longer sharing

office space with Child and Family Adoption, Inc." and requested that all billing for the

toll free number be redirected. Jenkins further stated that Spool "resigned as World

Child's authorized NY representative, and consequently, has renounced his authority to

act on behalf of World Child." Jenkins concluded the letter stating that Goolsby and

Dibble were authorized to make all arrangements with American Long Lines and that

Dibble "continues in World Child's New York representative office." Jenkins letter closed

with "[f]eel free to contact . . . me through my law firm, Jenkins & Potak, at 301-977-8249,

regarding Spool's revocation of authority to act."

57.    In reality, Spool never resigned and never revoked his authority to act regarding the

American Long Lines account. In fact the toll free number belonged to CFA.

58.    The American Long Lines toll free number was a major marking tool for CFA, which

appeared in its advertisements, yellow pages ad and marketing material.

59.    Upon information and belief, on or about April 8, 2004, Dibble and Whittaker, acting at

the direction of Jenkins and Goolsby, removed the contents of confidential CFA client

files, including case notes, and made copies of child abuse clearances, criminal

clearances and other documents. All that remained were empty files.

60.    Upon information and belief, on or about April 8, 2004, Dibble and Whittaker, acting at

the direction of Jenkins and Goolsby, made unauthorized copies Spool's social work

license and CFA agency licenses and removed these copies from the office.

61.    Upon information and belief, on or about April 8, 2004, Dibble and Whittaker, acting at

the direction of Jenkins and Goolsby, removed office supplies, marketing materials

including agency letterhead, and computer files from the CFA office.

62.    Upon information and belief, on or about April 8, 2004, Dibble and Whittaker, acting at
       the direction of Jenkins and Goolsby, created a New York representative office [NY
       Representative Office] for World Child in Dibble's home utilizing the looted assets of
       CFA.

63.    The New York Representative Office was neither a foreign registered corporation nor
       subsidiary of World Child but a distinct and separate enterprise created to conduct
       business in New York.

64.    The New York Representative Office was created by Dibble and Whittaker and utilized
       the looted assets of CFA in carrying out its activities.

65.    On April 6, 2004, Goolsby sent a letter on World Child letterhead announcing that World
       Child's New York Office has a new address.  The letter stated that World Child was
       "moving" its New York offices with a mailing address of World Child International, PO
       Box 938, New Paltz, New York 12561.  The new phone number was 845-895-8279.  The
       letter reassures clients that "some of you may have questions about your individual
       cases, and if so, you may contact either your case manager directly, or Susan or Dorene
       at the new, New York office number. . . . All of us at World Child are excited about this
       new arrangement, and are ready to help with your adoption adventure . . . I felt it was
       important to let everyone know that even though we are relocating, World Child is still
       moving forward on your individual case."

66.    On or about April 14, 2004, either Dibble or Whittaker, acting through the New York
       Representative Office, forged Spool's name on documents, including Spool's social work
       license, agency license and home study, which were then submitted to the Immigration

10

and Naturalization Service and placed in a client's foreign dossier package and sent to the Guatemalan government. Whittaker notarized the signature as though Spool was present in front of her.

67. Spool never authorized the activities in paragraph 64, 65 and 66.

68. Upon information and belief, the New York Representative Office collected money from this and similar acts and forwarded the funds to World Child.

69. On April 23, 2004, Jenkins sent an email to Goolsby which was copied to Dibble and Whittaker. The purpose of the email was to discuss the New York Representative Office's operations. The email concluded with the following admonition: "I am sure Dibble and Whittaker want to keep things as smooth and hassle-free as possible; we can work out the details or whatever when things are less hectic, if the issue right now is just keeping the clients' moving thru the system."

70. In May 2004, the NY Representative Office sent letters through the United States mails to CFA's stolen client list inviting past and present CFA clients to World Child's "Tenth Annual" picnic. In reality it was the New York Representative Office's first picnic. The picnic was the same day and location as CFA's long-scheduled tenth annual picnic. The CFA annual picnic was an important marketing and good will event for CFA during the past decade.

71. On July 21, 2004, Dibble and Whittaker were arrested and arraigned on felony forgery and stolen document charges. Dibble pled guilty in 2005 to forgery charges involving several CFA clients including the Fergusons.

72.   On July 28, 2004, Spool sent a letter to Goolsby informing her that "the recent arrest on felony charges of your personnel in the World Child New York office, is the result of their forging Child & Family documents, stealing, and illegally using my social work license and this agencies state license.  These are very serious offenses."

73.   During this entire period of time – from April through July 2004 –Spool on behalf of CFA conducted good faith negotiations with World Child to obtain the monies owed from 2003 and 2004.  World Child repeatedly rejected Spool's attempts to settle the matter and ultimately gave him nothing on the significant sums owed CFA.

74.   During this entire period of time, World Child made numerous attempts via interstate federal wires and/or federal mail to convince CFA clients that World Child would continue to represent them in their adoption in the same manner and with the same professional standards as CFA and that there was essentially no difference between the CFA – World Child joint venture and the New York Representative Office.

75.   In addition, during this entire period of time, the New York Representative Office attempted to get clients to cancel contractually obligated and pre-paid post-placement services with CFA and instructed those clients to obtain refunds which could be utilized to obtain post-placement services arranged by the New York Representative Office.

76.   The Defendants, employing interstate federal wires and/or federal mails, submitted adoption paperwork to the Immigration and Naturalization Service, the State of New York and foreign governments including Russia, utilizing CFA letterhead to create the impression that CFA, an authorized New York adoption agency, was still working on the account, when in fact Dibble had created and oftentimes forged the documents.

77.   As of January 2005, World Child still listed Susan Dibble's number and the New Paltz, New York post office box as the New York Representative Office contact information.

78.   Throughout this period, Spool and CFA communicated extensively with the Defendants utilizing interstate wires and federal or international mails including fax, email, postal mail, express mail services such as FedEx, local and long distance telephone, toll free telephone, cell phone and international telephone services.

### RICO FACTUAL ALLEGATIONS – BRUCE AND CHARLENE FERGUSON

79.   The Plaintiffs repeat and reallege Paragraphs 1 through 78 above.

80.   On January 21, 2003, the Fergusons submitted a World Child application to adopt a child from Russia.  They submitted this form to World Child/New York at CFA's address in New Paltz, New York.

81.   On or about January 30, 2003, the Fergusons received a letter on World Child letterhead welcoming them to the Russia Program.  The letter stated that "it is not acceptable to request a 'healthy' child.  Russian medical reports often, if not always, list a medical diagnosis at birth.  Most often, these diagnoses do not accurately reflect the health status of the child. . . . Your homestudy must state that you want to adopt a child who is "as healthy as possible" unless you will consider certain special needs, such as limb deformities, cleft palate, etc."  The letter goes on to state that "if you have an arrest record, or if you have any medical conditions or past history of serious medical conditions, please contact us of have your social worker contact us to discuss the wording of your homestudy. . . . Your homestudy must state that you are aware that your

13

child may have undiagnosed medical conditions, and that you are aware that there may

be unforeseen delays."

82.   The World Child Memo of Understanding offers that "[m]any of our families have

enjoyed exchanging information with other families over the internet. Your case

manager will be glad to provide you with the e-mail addresses of willing World Child

clients who are either in the process of adoption or have completed their adoptions.  We

strongly discourage our clients from posting on the list serves, as it has the potential of

affecting or disrupting adoptions. The list serves are read by foreign government

officials, and the officials often do not like what they are reading as it is also possible to

misinterpret what has been posted. Past postings have negatively impacted foreign

adoptions."

83.   Throughout the adoption process, letters and faxes from World Child continued to

indicate that CFA was an important and integral part of their service delivery in New

York and that CFA would assist the Fergusons at every step.

84.   On or about April 6, 2004, the Fergusons received a letter on World Child letterhead

stating that "World Child's New York Office has a NEW Address."  It listed the new

mailing address as World Child International, PO box 939, New Paltz, New York 12561.

The new phone number was 845-895-8279.  The email addresses of the new office was

Sdibble@hvc.rr.com and DoreneW@hvc.rr.com.  There was no indication whatsoever

that this new office was no longer affiliated with CFA, that the New York Representative

Office was now being run by unlicensed individuals through an adoption "agency" which

was not recognized by the State of New York as an authorized adoption agency.  The

14

purpose of this subterfuge was to confuse clients like the Fergusons in order to continue processing adoptions and collecting fees for the direct benefit of the RICO defendants.

85.    On or about April 20, 2004, the Fergusons received a letter from the New York Representative Office indicating that they needed visas.  The Fergusons were required to send $850 in a check made payable to World Child International which was sent to World Child International, 113 Park Avenue, Falls Church, Virginia 22046.  The letter was signed Susan Dibble, NY Regional Coordinator and listed 845-895-8279 as the contact number.

86.    On or about July 27, 2004, the Fergusons received a fax from Susan Dibble requesting an additional $550 for visas.  The check and documentation were requested by overnight FedEx, Airborne or DHL to World Child's Falls Church Office.

87.    In preparation for their trip to Russia to pick up their child, the New York Representative Office sent a fax to the Fergusons instructing them to take to Russia "a variety of bills, including approximately twenty bills each of $1s, $5s, $10s, $20s, and $50s. The rest can be $100 dollar bills. Bills that are over ten years old, are very wrinkled, or are town or written upon, will not be acceptable."

88.    World Child orally instructed Plaintiff Bruce Ferguson to bring thousands of dollars in new $100 bills to Russia and to not declare the cash to United States Customs.  As soon as he arrived in Russia, Defendant Panasov demanded all of Bruce Ferguson's cash and scrutinized each bill rejecting any that had the slighted imperfection.

89.    The World Child contract states that "Russia is a 'gift giving' culture. Gifts represent more than just a thank you or form of appreciation. In many instances they are

necessary to establish your credibility or demonstrate your knowledge of another person's status."

90. The Defendants instructed the Fergusons to provide "Gifts for Russia." The guidance states "[t]hese are gifts, <u>not bribes</u>. Gifts are part of the Russian way of doing business... <u>Please do not</u> bring gifts that are of poor quality, or that do not work properly. If <u>you</u> would be insulted if you received a particular item, or if you would be ashamed to give such a gift to a friend, please don't bring it to Russia! The easiest way to present the gifts is to bring gift bags and tissue paper, rather than wrapping the gifts. Your Russian coordinator will either be cueing you as to what to give to whom, or she will give the gifts for you. She may also combine several smaller gifts into one larger gift."

91. Several of the gifts the Fergusons were instructed to provide went to Defendant Panasov and the World Child Moscow Office staff even though the Ferguson's paid over $11,000 in foreign fees.

92. On April 12, 2004 the Fergusons paid World Child $1000 for foreign registrations and visas.

93. On May 12, 2004, the Fergusons paid World Child $12,200.

94. On or about May 21, 2004, Susan Dibble provided the Fergusons with a forged homestudy on CFA letterhead. The homestudy was originally done by CFA in 2003. Although an updated homestudy was necessary for the Fergusons to complete their adoption, the New York Representative Office never did it. Instead they re-printed the 2003 homestudy on CFA letterhead and forged the social worker's signature on the report. Susan Dibble then notarized the report and attached an unauthorized copy of

CFA's license, dated June 25, 2004. The license was dated almost one month after the signature date on the homestudy report.

95. Upon information and belief, Dibble also forged all of the updated supporting documents needed to complete the Ferguson's adoption and that these documents were presented on CFA letterhead with forged signatures. This form includes a New York State updated Child Abuse Clearance. The New York Representative Office charged the Fergusons $313 to obtain county and state certifications for foreign documents which were forged by Dibble.

96. In early August, 2004, the Fergusons traveled to Russia to adopt a little girl. They were met in Moscow by Panasov who was their constant companion during their stay in Russia. Panasov provided translation and transportation services for the Fergusons and legally represented them before the local civil court which was conducting the adoption. They were expected to entertain and feed him and provide cash and other gifts for him, his staff and family.

97. On August 10, 2004 the Russian civil court denied the Fergusons adoption based on numerous irregularities in the documents submitted by World Child through the New York Representative Office and Defendant Panasov. Unbeknownst to the Fergusons at that time, several of these documents contained forgeries by Defendant Dibble.

98. On August 17, 2004, the Fergusons received a fax from Dibble of an email to Dibble indicating that Defendant Panasov was representing them before the Russian courts as their attorney by appealing the adverse trial court decision to the Russian Supreme

Court. The Fergusons neither authorized this nor were aware that Panasov was an attorney authorized to practice before the Russian courts.

99.    On August 18, 2004, Defendant Panasov filed a handwritten appeal on behalf of the Fergusons. That appeal was denied on August 27, 2004.

100.   Upon information and belief, on December 3, 2004, Dibble and the New York Representative Office forged the Ferguson's signatures on a New York State Central Register Database Check. This check is required for international adoptions and contains sensitive and confidential information about an applicant's child abuse and neglect history. This information was not requested by the Fergusons. It was submitted by the New York Representative Office through an affiliated agent called Family Connections in Cortland, New York. The Fergusons know of no legitimate reason why this request was submitted using forged signatures of their name.

101.   The Fergusons never received a return of their $3950 agency fee.

102.   Throughout this period, the Fergusons communicated extensively with the Defendants utilizing interstate wires and federal or international mails including fax, email, postal mail, express mail services such as FedEx, local and long distance telephone, toll free telephone, cell phone and international telephone services.

## RICO ENTERPRISE ALLEGATIONS 18 USC 1961(4)

103.   The Plaintiffs repeat and reallege Paragraphs 1 through 102 above.

104.   The Plaintiffs allege that the New York Representative Office was created by Goolsby, Jenkins and World Child to engage in conduct that constitutes a RICO pattern of

racketeering activity.  Plaintiffs allege that the New York Representative Office is a RICO enterprise as that term is defined in 18 USC 1961(4).

105.   The Plaintiffs allege that the RICO enterprise is managed by Dibble and Whittaker and directed and controlled by Jenkins, Goolsby and World Child for the benefit of all the Defendants including Panasov.

106.   The Plaintiffs allege that the Defendants direct and control the affairs of the New York Representative Office, including the solicitation of clients to commence and/or continue their international adoption paperwork through World Child, and the efforts to conceal from detection by Plaintiffs the fraudulent and illegal alteration, signing and certification of their international adoption documents.  Plaintiffs allege that World Child is engaged in activities that affect federal interstate and foreign commerce.

## RICO PATTERN OF RACKETEERING ACTIVITY 18 USC 1961(5)

107.   The Plaintiffs repeat and reallege Paragraphs 1 through 106 above.

108.   The Plaintiffs allege that Defendants engaged in the above activities and/or conduct that constitutes the following form of "racketeering activity," as that term is defined in 18 USC 961(1): Federal Principal and Aider and Abettor Liability [18 USC 2]; Federal Mail Fraud [18 USC 1341]; Federal Mail Fraud – Aiding and Abetting [18 USC 1341]; Federal Mail Fraud – Conspiracy [18 USC 1341]; Federal Wire Fraud [18 USC 1343]; Federal Wire Fraud –Aiding and Abetting [18 USC 1343]; Federal Wire Fraud – Conspiracy [18 USC 1343];  Federal Intangible Personal Property Right Deprivation [18 USC 1346]; Federal Racketeering [18 USC 1952]; Federal Racketeering – Aiding and Abetting [18 USC 1952]; Federal Racketeering – Conspiracy [18 USC 1952]; Federal Money Laundering [18 USC

1956]; Federal Money Laundering re: Aiding and Abetting [18 USC 1956]; Federal Money

Laundering – Conspiracy [18 USC 1956]; Federal Criminally Derived Property [18 USC

1957]; Federal Criminally Derived Property – Aiding and Abetting [18 USC 1957]; and,

Federal Criminally Derived Property – Conspiracy [18 USC 1957].

109.    The Plaintiffs allege that above activities and/or conduct engaged in by the Defendants

constituted a "pattern of racketeering activity," as that term is defined pursuant to 18

USC 1961(5).

110.    The Plaintiffs further allege that the activities and conduct engaged in by the Defendants

was both related as to the modus operandi engaged in by the Defendants of depriving

the Plaintiffs of their interests in business and property, and was continuous inasmuch

as the activities and conduct engaged in by the Defendants exhibited a realistic, long

term threat of continued future injury to the Plaintiffs' interest in the Plaintiffs' business

and property.

111.    The Plaintiffs allege that the Defendants have, by and through the pattern of

racketeering activity alleged herein, victimized the following persons: the Fergusons in

the amount of at least $7700 and Spool/CFA of at least $50,000 per year.

112.    The Plaintiffs allege that additional victims exist and the instances and identities

referenced above are cited by example and not by restriction.

113.    The Plaintiffs have sustained injuries to their respective interests in business or property

as a result of the Defendants' activities and conduct.

114.    The Plaintiffs are entitled to recover compensatory damages according to offer of proof

at time of trial.  The Plaintiffs are also entitled to recover an award of exemplary and

punitive damages.  The Plaintiffs are entitled to recover attorneys' fees, costs, and

prejudgment interest.

### FIRST CLAIM FOR RELIEF
### FOR PRIMARY CONTRAVENTION OF RICO 18 USC 1962(e)
### AGAINST ALL DEFENDANTS

115.    The Plaintiffs repeat and reallege Paragraphs 1 through 114 above.

116.    The Defendants violated the following federal laws:  Predicate Offense Contraventions

[18 USC 1961(1)(B)]; Principal and Aider and Abettor Liability [18 USC 2]; Mail Fraud [18

USC 1341]; Mail Fraud – Aiding and Abetting [18 USC 1341]; Mail Fraud – Conspiracy [18

USC 1341]; Wire Fraud [18 USC 1343]; Wire Fraud – Aiding and Abetting [18 USC 1343];

Wire Fraud –Conspiracy [18 USC 1343]; Intangible Personal Property Right Deprivation

[18 USC 1346]; Racketeering [18 USC 1952]; Racketeering – Aiding and Abetting [18 USC

1952]; Racketeering – Conspiracy [18 USC 1952]; Money Laundering [18 USC 1956];

Money Laundering – Aiding and Abetting [18 USC 1956]; Money Laundering –

Conspiracy [18 USC 1956]; Criminally Derived Property [18 USC 1957]; Criminally

Derived Property – Aiding and Abetting [18 USC 1957]; Criminally Derived Property –

Conspiracy [18 USC 1957].

117.    The Defendants engaged in the aforementioned activities, with the intent to harm the

Plaintiffs' interest in business or property.  The fraudulent activity engaged by the

Defendants affected the Plaintiffs' Spools and CFA's business and property in connection

with business activities that affect federal interstate commerce, resulting in the loss of

business opportunities and monies.

118.    The aforementioned activities constitute conduct engaged in by the Defendants to deprive the Plaintiff in his interest in business and/or property, by and through commission of federal mail fraud, federal wire fraud, federal racketeering, federal money laundering, and federal criminally derived property, and are therefore indictable as "racketeering activity" as that term is defined in 18 USC 1961(1)(5).

119.    The course of conduct engaged in by the Defendants constitute both continuity and relatedness of the racketeering activity, thereby constituting a "pattern of racketeering activity," as that term is defined in 18 USC 1961(5).

120.    The aforementioned pattern of racketeering activity committed by the Defendants is both relate and continuous inasmuch as it is designed and intended to cause damage and injury to the Plaintiffs' interest in business and property, and the Plaintiffs reasonably believe and apprehend that such conduct shall and will continue prospectively with correlative long term injury.

121.    The following defendants were employed by, or in the alternative, associated with the RICO enterprise: Dibble, Whittaker, Goolsby, Jenkins, Panasov, World Child and Jenkins & Povtak.

122.    In conducting the business and affairs of the RICO enterprise, and in committing the acts, omissions, misrepresentations, and breaches referred to herein between early April 2004, and continuing up through and including the initiation of these proceedings, the Defendants engaged in a pattern of racketeering activity in contravention of 18 USC 1962(c) inasmuch as the Defendants were employed by, or associated with, a RICO enterprise that is engaged in activities that affect federal interstate and foreign

commerce, and conducted such RICO enterprise affairs by and through a pattern of racketeering activity.

123.    The Plaintiffs are entitled to recover, pursuant to 18 USC 1964(c), treble damages in the amount to be determined by offer of proof at time of trial. The Plaintiffs are also entitled to recover attorneys' fees and costs of this litigation, as well as damages arising from lost profits and lost business opportunities attributable to the activities engaged in by the Defendants.

**SECOND CLAIM FOR RELIEF**
**FOR RICO AIDING AND ABETTING**
**IN CONTRAVENTION OF 18 USC 1962(c) AND 18 USC 2(a)-(b) AND 1962(c)**
**AGAINST ALL DEFENDANTS**

124.    The Plaintiffs repeat and reallege Paragraphs 1 through 123 above.

125.    The Defendants facilitated, encouraged, and otherwise promoted the execution, perpetration, and perpetuation of the racketeering activities alleged herein by engaging in the following activities: (a) the Defendants condoning the practices and procedures engaged in by Dibble and Whittaker to deprive the Plaintiffs of their interest in business and property; (b) the Defendants using federal mails and federal wires to lull victims like the Fergusons into a false sense of security by consistently representing that their adoption would be properly handled when, in fact, the Defendants were perpetuating fraud and forgery.

126.    The Defendants were aware of the commission of the primary RICO contraventions committed by Dibble and Whittaker, and the Defendants substantially assisted Dibble and Whittaker in the commission of the primary RICO contraventions thereby deriving a monetary benefit as a result to the Plaintiffs' detriment.

23

127.    The Plaintiffs are entitled to recover, pursuant to 18 USC 1964(c), treble damages in the amount to be determined by offer of proof at time of trial. The Plaintiffs are also entitled to recover attorneys' fees and costs of this litigation, as well as damages arising from lost profits and lost business opportunities attributable to the activities engaged in by the Defendants.

## THIRD CLAIM FOR RELIEF
## FOR CONTRAVENTION OF 18 USC 1962(c)

128.    The Plaintiffs repeat and reallege Paragraphs 1 through 127 above.

129.    At all times material herein, Goolsby, Jenkins, Pansov, and Jenkins and Povtak acted as agents, employees, directors, designees, officers, partners, representatives, and servants of World Child and engaged in the fraudulent conduct in such representative capacities, and that as a proximate result, World Child derived a benefit thereby.

130.    The aforementioned Defendants exercised control and direction of Dibble and Whittaker relative to the complained of fraudulent activities, with the intent to harm the Plaintiffs in their business and property interests. The fraudulent activities engaged in by Dibble and Whittaker on behalf of World Child affected the Plaintiffs' business activities affecting federal commerce, resulting in deprivation of such property and business interests as alleged herein.

131.    The commission of the afore described fraudulent activities by Dibble and Whittaker arose within the course and scope of her agency with World Child and therefore World Child is derivatively liable for the commission of Dibble and Whittaker's 18 USC 1962(c) contraventions.

132.  The Plaintiffs are entitled to recover, pursuant to 18 USC 1964(c), treble damages in the amount to be determined by offer of proof at time of trial. The Plaintiffs are also entitled to recover attorneys' fees and costs of this litigation, as well as damages arising from lost profits and lost business opportunities attributable to the activities engaged in by the Defendants.

### FOURTH CLAIM FOR RELIEF
### FOR CONTRAVENTION OF 18 USC 1962(e)

133.  The Plaintiffs repeat and reallege Paragraphs 1 through 132 above.

134.  Commencing in early April 2004 and at all times material herein, the Defendants mutually agreed to engage in the aforementioned racketeering activities giving rise to 18 USC 1962(c) contraventions, and that conspiratorial agreement was motivated to cause the Fergusons to pay for services, depriving them of their interest in property.  The Plaintiffs further allege that such conspiratorial agreement constitutes contravention of 18 USC 1962(d).

135.  The aforementioned Defendants are conspiratorially liable under application of the Pinkerton Doctrine as found in *Pinkerton, v. United States*, 328 US 640 (1946) and *Salinas v. United States*, 522 US 52 (1997), for the substantive 18 USC 1962(c) contraventions committed by the Defendants inasmuch as the Defendants engaged in the fraudulent activities that constitute the RICO pattern of racketeering activity; the Defendants are members of the RICO conspiracy designed and intended to contravene 18 USC 1962(c); the Defendants engaged in activities in furtherance of advancing and promoting the RICO conspiracy designed and intended to contravene 18 USC 1962(c); all Defendants are members of the RICO conspiracy at and during the time frame the fraudulent

activities were committed that constitute the RICO pattern of racketeering activity; and, the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

136.   The Plaintiffs are entitled to recover, pursuant to 18 USC 1964(c), treble damages in the amount to be determined by offer of proof at time of trial. The Plaintiffs are also entitled to recover attorneys' fees and costs of this litigation, as well as damages arising from lost profits and lost business opportunities attributable to the activities engaged in by the Defendants.

## FIFTH CLAIM FOR RELIEF
## FOR PRIMARY CONTRAVENTION OF 18 USC 1962(a)

137.   The Plaintiffs repeat and reallege Paragraphs 1 through 136 above.

138.   The aforementioned activities constitute conduct engaged in by the Defendants to deprive the Plaintiffs of their interest in business and property, by and through commission of federal mail fraud, federal wire fraud, federal racketeering, federal money laundering, and federal criminally derived property, and are therefore indictable as "racketeering activity," as that term is defined in 18 USC 1961(1). The course of conduct engaged in by the Defendants constitute both continuity and relatedness of the racketeering activity, thereby constituting a "pattern of racketeering activity," as that term is defined pursuant to 18 USC 1961(5).

139.   The aforementioned pattern of racketeering activity committed by the Defendants is both related and continuous inasmuch as it is designed and intended to cause damage and injury to the Plaintiffs' interest in business and property, and the Plaintiffs

reasonably believe and apprehend that such conduct shall and will continue prospectively with correlative long term injury.

140.   The Defendants invested proceeds in, and income derived by, a pattern of racketeering activity.

141.   The Plaintiffs allege that the Defendants, by and through the pattern of racketeering activity alleged herein above, invested income and/or proceeds derived therefrom, thereby acquiring absolute control and dominion to the exclusion of the Plaintiffs' interests.  The Plaintiffs allege that the Defendants further deprived them of their interests in business and property by engaging in activities that affect federal interstate and foreign commerce.  The Defendants engage in racketeering activity that affects federal interstate and foreign commerce.

142.   In conducting the business and affairs of the RICO enterprise, and in committing the acts, omissions, misrepresentations, and breaches referred to herein, the Defendants engaged in a pattern of racketeering activity in contravention of 18 USC 1962(a) inasmuch as said defendants invested said proceeds into World Child, Inc., said RICO enterprise that is engaged in activities that affect federal interstate and/or foreign commerce, and conducted such RICO enterprise affairs by and through a pattern of racketeering activity.

143.   The Plaintiffs allege that they sustained the following racketeering investment enterprisal injuries: (a) incurring expense and fees to institute appropriate legal recourse to recover funds obtained by the Defendants; (b) the Defendants' transmission of the Plaintiffs' funds to third party repositories for use by the Defendants in furthering their

27

illegal activities by applying those funds to various personal, business, or commercial

pursuits to the exclusion of the Plaintiffs' interest in business and property; (c) the

Defendants prior efforts to lull the Plaintiffs into a false sense of security that their

adoption would be handled in a legitimate and professional manner.

144.   The above injuries constitute 18 USC 1962(a) racketeering investment enterprisal

injuries inasmuch as the injuries sustained are separate and distinct from the injuries

arising from the natural consequences of the commission of the 18 USC 1962(a) offense.

145.   The Plaintiffs are entitled to recover, pursuant to 18 USC 1964(c), treble damages in the

amount to be determined by offer of proof at time of trial. The Plaintiffs are also entitled

to recover attorneys' fees and costs of this litigation, as well as damages arising from lost

profits and lost business opportunities attributable to the activities engaged in by the

Defendants.

### SIXTH CLAIM FOR RELIEF
### FOR RICO AIDING AND ABETTING
### PRIMARY CONTRAVENTION OF 18 USC 1962(a)

146.   The Plaintiffs repeat and reallege Paragraphs 1 through 145 above.

147.   The Defendants facilitated, encouraged, and/or otherwise promoted the execution,

perpetration, and perpetuation of the racketeering activities alleged herein by engaging

in the following activities: (a) the Defendants condoned the practice and procedure

engaged in by Dibble and Whittaker to deprive the Plaintiffs of their interests in business

and property; (b) the Defendants recruitment and utilization of Dibble and Whittaker as

agents when in fact they were unlicensed individuals operating a unauthorized entity to

facilitate and expedite the transmission of funds received from the Plaintiffs and

similarly situated victims; and (c) the Defendants using federal mails and federal wires to lull victims like the Fergusons into a false sense of security by consistently representing that their adoption would be properly handled when, in fact, the Defendants were perpetuating fraud and forgery which the Defendants knew or should have known would result in failure.

148.    The Defendants were aware of the commission of the primary RICO contraventions committed by Dibble and Whittaker, and the Defendants substantially assisted them in the commission of the primary RICO contraventions, thereby deriving a monetary benefit as a result to the Plaintiffs' detriment.

149.    The Plaintiffs are entitled to recover, pursuant to 18 USC 1964(c), treble damages in the amount to be determined by offer of proof at time of trial. The Plaintiffs are also entitled to recover attorneys' fees and costs of this litigation, as well as damages arising from lost profits and lost business opportunities attributable to the activities engaged in by the Defendants.

## SEVENTH CLAIM FOR RELIEF
## FOR CONTRAVENTION OF 18 USC 1962(a)

150.    The Plaintiffs repeat and reallege Paragraphs 1 through 149 above.

151.    At all times material herein, Goolsby, Jenkins, Pansov, and Jenkins and Povtak acted as agents, employees, directors, designees, officers, partners, representatives, and servants of World Child and engaged in the fraudulent conduct in such representative capacities, and that as a proximate result, World Child derived a benefit thereby.

152.    The aforementioned Defendants exercised control and direction of Dibble and Whittaker relative to the complained of fraudulent activities, with the intent to harm the

Plaintiffs in their business and property interests. The fraudulent activities engaged in by Dibble and Whittaker on behalf of World Child affected the Plaintiffs' business activities affecting federal commerce, resulting in deprivation of such property and business interests as alleged herein.

153.   The commission of the afore described fraudulent activities by Dibble and Whittaker arose within the course and scope of her agency with World Child and therefore World Child is derivatively liable for the commission of Dibble and Whittaker's 18 USC 1962(a) contraventions.

154.   The Plaintiffs are entitled to recover, pursuant to 18 USC 1964(c), treble damages in the amount to be determined by offer of proof at time of trial. The Plaintiffs are also entitled to recover attorneys' fees and costs of this litigation, as well as damages arising from lost profits and lost business opportunities attributable to the activities engaged in by the Defendants.

## EIGHTH CLAIM FOR RELIEF
## FOR CONTRAVENTION OF RICO SECTION 1962(a)

155.   The Plaintiffs repeat and reallege Paragraphs 1 through 154 above.

156.   The aforementioned Defendants are conspiratorially liable under application of the Pinkerton Doctrine as found in *Pinkerton, v. United States*, 328 US 640 (1946) and *Salinas v. United States*, 522 US 52 (1997), for the substantive 18 USC 1962(a) contraventions committed by the Defendants inasmuch as the Defendants engaged in the fraudulent activities that constitute the RICO pattern of racketeering activity; the Defendants are members of the RICO conspiracy designed and intended to contravene 18 USC 1962(a); the Defendants engaged in activities in furtherance of advancing and promoting the

RICO conspiracy designed and intended to contravene 18 USC 1962(a); all Defendants are members of the RICO conspiracy at and during the time frame the fraudulent activities were committed that constitute the RICO pattern of racketeering activity; and, the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

157.    Commencing in early April 2004 and at all times material herein, the Defendants mutually agreed to engage in the aforementioned racketeering activities giving rise to 18 USC 1962(a) contraventions, and that conspiratorial agreement was motivated to cause the Fergusons to pay for services, depriving them of their interest in property.  The Plaintiffs further allege that such conspiratorial agreement constitutes contravention of 18 USC 1962(d).

158.    The Plaintiffs are entitled to recover, pursuant to 18 USC 1964(c), treble damages in the amount to be determined by offer of proof at time of trial. The Plaintiffs are also entitled to recover attorneys' fees and costs of this litigation, as well as damages arising from lost profits and lost business opportunities attributable to the activities engaged in by the Defendants.

## NINTH CLAIM FOR RELIEF
## FOR IMMEDIATE ISSUANCE OF ORDERS DISSOLVING RICO ENTERPRISE AND PERMANENT EXPULSION OF INDIVIDUAL DEFENDANTS FROM RICO ENTERPRISE PURSUANT TO 18 USC 1964(a)

159.    The Plaintiffs repeat and reallege Paragraphs 1 through 158 above.

160.    The Plaintiffs petition this Court, pursuant to 18 USC 1964(a), to issue an order immediately dissolving the RICO enterprise inasmuch as said enterprise is a mere subterfuge and alter ego vehicle for the Defendants.

31

161. Furthermore, the Plaintiffs petition for issuance of an order commanding the immediate and permanent expulsion of individuals from further participatory management, direction, and control of World Child's operations in New York.

162. The RICO enterprise is engaged in activities that affect federal interstate and foreign commerce.

163. The Plaintiffs are entitled to recover, pursuant to 18 USC 1964(c), treble damages in the amount to be determined by offer of proof at time of trial. The Plaintiffs are also entitled to recover attorneys' fees and costs of this litigation, as well as damages arising from lost profits and lost business opportunities attributable to the activities engaged in by the Defendants.

## TENTH CLAIM FOR RELIEF
## FOR CONTRAVENTION OF 18 USC 1962(a)-(d)

164. The Plaintiffs repeat and reallege Paragraphs 1 through 163 above.

165. Upon information and belief, the Plaintiffs allege that World Child, aided and abetted by Jenkins, Goolsby and Jenkins & Povtak, created a successor non-profit entity of unknown origin, under the exclusive control and operated by World Child.

166. The Plaintiffs further allege that said successor entity constitutes an alter ego vehicle, posing as an elaborate subterfuge interposed between Defendants and Plaintiffs, for purposes of impairing, impeding and frustrating efforts to achieve a full and accurate accounting, collection and recovery of properties and monies actually earned and owing, and to effectively and absolutely immunize World Child from execution, attachment and other alternative provisional process.

167.   The Plaintiffs allege that some unknown entity, association, trust, partnership or non-profit corporation is a successor entity to the assets and properties previously held and obtained by the Defendants from the Plaintiffs, and are therefore susceptible to liability under the federal RICO as previously alleged herein, and that said successor in interest entity and/or configuration is a depository vehicle designed to facilitate the absolute immunization and protection of said properties from execution, attachment, and garnishment by judgment creditors.

168.   The Plaintiffs further allege that such unknown entity or configuration failed to provide adequate or valuable consideration in connection with said transfer of properties.

169.   The Plaintiffs are entitled to recover, pursuant to 18 USC 1964(c), treble damages in the amount to be determined by offer of proof at time of trial. The Plaintiffs are also entitled to recover attorneys' fees and costs of this litigation, as well as damages arising from lost profits and lost business opportunities attributable to the activities engaged in by the Defendants.

## CONCLUSION

WHEREFORE, the Plaintiffs pray for judgment against the Defendants, and each and every one of them, as follows:

1.   For recovery of compensatory damages arising from primary contravention of RICO Section 1962(a), (c)-(d), pursuant to RICO Section 1964(c);

2.   For recovery of compensatory damages arising from secondary contravention of RICO Section 1962(a), (c)-(d), pursuant to RICO Section 1964(c);

3.  For recovery of compensatory damages related to respondeat superior, arising from primary contravention of RICO Section 1962(a), (c)-(d), pursuant to RICO Section 1964(c);

4.  For entry of equitable relief arising from contravention of RICO Section 1962(a), (c)-(d), pursuant to RICO Section 1964(a)-(b);

5.  For recovery of compensatory damages arising from conspiratorial contravention of RICO Section 1962(a), (c)-(d), pursuant to RICO Section 1964(c);

6.  For recovery of attorneys' fees and costs pursuant to pursuant to RICO Section 1964(c);

7.  For recovery of prejudgment interest pursuant to pursuant to RICO Section 1964(c);

8.  For such other and further relief as the Court deems just and proper in the premises.

Dated: June 5, 2006
    White Plains, New York

Respectfully submitted,

James R. Marsh (JM9320)
Attorney for the Plaintiffs

MARSH MENKEN & WEINGARDEN PLLC
81 Main Street – Suite 305
White Plains, New York 10601-1719
Phone (914) 686-4456
Fax (914) 206-3998
Email JamesMarsh@MMWLaw.us